**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| CHRISTOPHER FLIGER and ANNA FLIGER, | ) ) ) | |
| Plaintiffs, | ) ) | |
| | ) | No. 15 C 5704 |
| v. | ) ) | Judge Jorge L. Alonso |
| JOHN F. KELLY, JEFF SESSIONS, JAMES MCCAMENT, THOMAS CIOPPA, and MARTHA MEDINA-MALTES, | ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Before the Court are the parties' cross-motions for summary judgment. For the reasons explained below, plaintiffs' motion is denied and defendants' motion is granted.

## BACKGROUND

Plaintiffs, Christopher Fliger ("Christopher") and Anna Fliger ("Anna"), married on January 29, 2011. On March 24, 2011, Christopher filed a Form I-130, Petition for Alien Relative, on behalf of Anna, a citizen and national of Poland, with United States Citizenship and Immigration Services ("USCIS"). USCIS denied the petition on August 9, 2012. Although the agency did not question the validity of Christopher and Anna's marriage, it based the denial on the ground that federal law prohibited approval because Anna had previously sought to be accorded status as the spouse of another United States citizen by reason of a marriage that was determined to have been entered into for the purpose of evading the immigration laws. After *de novo* review, the Board of Immigration Appeals ("BIA") affirmed USCIS's decision and dismissed the appeal on October 15, 2014. On May 29, 2015, the BIA denied Christopher's motion to reconsider the dismissal. Plaintiffs then filed

this lawsuit, challenging the denial of the petition by the BIA and USCIS and seeking injunctive and declaratory relief under the Administrative Procedure Act (the "APA"), 5 U.S.C. §§ 701-706.[1] Plaintiffs assert a second claim for violation of their Fifth Amendment due process rights, in which they allege that USCIS refused to provide them with "the sole piece of derogatory evidence" upon which its decision was based. (ECF No. 1, Compl. ¶ 41.)

**UNDISPUTED MATERIAL FACTS**

Anna's birth name is Anna Pienkowski. On August 21, 1995, she married Fred Kirschnick, a United States citizen. At the time, Anna was 18 years old and Kirschnick was 71. Anna was not in immigration proceedings at the time, nor had she ever had contact with the immigration authorities.

On June 20, 1996, Kirschnick filed a Form I-130, Petition for Alien Relative, on Anna's behalf, seeking to classify her as the spouse of a United States citizen. On October 6, 2003, Anna filed a Form I-485, Application to Adjust Status, to adjust her status to that of a permanent resident.

On August 24, 2007, USCIS District Adjudications Officer Kevin O'Neill interviewed Kirschnick, while Kirschnick was living at Resurrection Nursing and Rehabilitation Center ("Resurrection") in Park Ridge, Illinois. (A.R. 466.)[2] Kirschnick, a diabetic, was living there after having had his leg amputated a few years earlier and having suffered a stroke in 2007. According to USCIS's Record of Sworn Statement from the interview (which was prepared by O'Neill), when

---

[1]Since this action was filed, changes have occurred among the defendant officeholders. Accordingly, the Clerk of Court is directed to substitute as defendants 1) John F. Kelly for his predecessor, Jeh Charles Johnson, as United States Secretary of Homeland Security; 2) Jeff Sessions for his predecessor, Loretta E. Lynch, as United States Attorney General; and 3) James McCament, Acting Director of USCIS, for his predecessor, Leon Rodriguez.

[2]Citations to "A.R." refer to the Administrative Record, filed in this Court as ECF No. 17.

2

Kirschnick was asked where he had met Anna, he replied that they had met through Anna's sister, who had been Kirschnick's house cleaner until Anna took over the job. (*Id.* at 467.) When O'Neill asked whether they had "start[ed] living together right away after marriage," Kirschnick replied, "No. We didn't live together." (*Id.*) O'Neill and Kirschnick discussed how often the couple saw each other ("[a]bout six times a month"), what they did together for holidays (exchange gifts and spend time together and with family), and when they first opened their bank account ("about 2004," and before then, Kirschnick "used to write her checks with just [his] signature and she would fill in the top"). O'Neill then asked, "Did you ever feel she was using you or taking advantage of you for an immigration benefit or money?" (*Id.* at 468.) Kirschnick replied, "No, I never felt that way. In fact, I feel like I have taken advantage of her because she is such a good looking girl. We have made love many times." (*Id.*) When asked whose idea it had been for Kirschnick to file his petition, he replied, "She suggested it. I found her crying while cleaning my house. She told me she was going to be deported and I asked if there is anything I could do to help her. She told me to marry her so she could stay here. We never lived together." (*Id.*) After O'Neill asked Kirschnick whether he understood all of the questions that he was asked and received a reply in the affirmative, the interview ended. (*Id.*) The Record of Sworn Statement bears the signatures of O'Neill, Kirschnick, and a witness. (*Id.*)

At that interview, Kirschnick also signed a USCIS form titled "Withdrawing Petition for Alien Relative." (*Id.* at 473.) The statement on this form reads as follows:

> On June 20, 1996, I filed a Petition for Alien Relative (Form I-130) on behalf of Anna Pienkowski. I want to withdraw my petition because of the following:
>
> I met Anna through her sister. Her sister was a housecleaner for me. Anna took over her sister's housecleaning. While she was working for me, Anna asked me to marry her so she wouldn't be deported and so she could get an immigration benefit. I never lived with Anna Pienkowski nor do I live with her right now.

3

(*Id.*)

On the same date, August 24, 2007, O'Neill separately interviewed Anna. According to the Record of Sworn Statement from that interview, Anna corroborated many of Kirschnick's answers, although she varied on some details. (*Id.* at 470-71.) When asked whether she and Kirschnick had started living together right away after marriage, Anna said, "No[,] it took a little while. In 1999 we started living together. We only lived together for a year. He lost his business from a business scam and we were homeless for a while. He went to a nursing home. I went to my sister's house." (*Id.* at 470.)

On the same date, USCIS formally acknowledged that Kirschnick's I-130 petition was withdrawn pursuant to his request, and it therefore denied Anna's I-485 petition (which was predicated on recognition as a spouse of a United States citizen through an I-130 petition). The notice to Anna of the decision stated: "When the visa petition filed on your behalf was withdrawn, you no longer had any basis to file for adjustment of status." (*Id.* at 704.) It also stated: "[Y]ou attempted to obtain an immigration benefit by entering into a fraudulent marriage. The petitioner, Fred Kirschnick, informed the interviewing officer that he married you so that you could stay in the United States and not be deported. The petitioner also stated that you and he never lived together." (*Id.*) Because Anna had entered into the marriage to obtain an immigration benefit fraudulently, the notice further stated, she was inadmissible to the United States, no longer eligible for employment authorization, and present in the United States in violation of law and thus required to depart, and her remaining in the United States without authorization could result in the initiation of removal proceedings. (*Id.* at 704-05.)

On September 26, 2007, Anna filed a motion to reopen and reconsider the denial of her I-485 petition. (*Id.* at 696-97.) With the motion, she filed an affidavit by Kirschnick, who stated therein,

4

among other things, that he had lived with Anna in a Des Plaines condominium from 1995 until 2000 and that when his leg was amputated, he had to move to a retirement home; at the time, he also had a house in Des Plaines; he and Anna had taken several trips together; their marriage was "a good one" despite their age difference; Anna visited him frequently and gave him a lot of support and courage; he was presently in a "bad mental and physical state"; at the time of the interview, he had been taking (unspecified) medications to prepare for cataract surgery; at that time, he could not "see anything" due to his use of eye drops; he did not understand some of O'Neill's questions; he was given documents to sign that he "did not know and could not see it"; he had "never intended to withdraw [his] petition to sponsor [his] wife and if such a document was presented to [him] and [he] signed it [he] did not know what [he] was signing"; and he did "not understand why this process takes 10 years for my wife to obtain her papers." (*Id.* at 698-99.)[3]

On May 9, 2008, USCIS denied the motion to reopen and reconsider the denial of Anna's petition. In its decision, USCIS stated that the brief in support of the motion was "given little weight because no factual evidence was submitted to support" the statements therein (that the unspecified medications Kirschnick had been taking caused him "temporary blindness and immobility [sic] to understand questions") and that, pursuant to 8 C.F.R. § 103.2(b)(6),[4] Kirschnick could not retract his withdrawal of the I-130 petition. (*Id.* at 692-93.)

Anna remained married to Kirschnick until his death on March 10, 2010. She made funeral

---

[3]Although the affidavit is signed, it is not dated, and while it states that Kirschnick was "duly sworn on oath," it bears a blank notary signature block.

[4]This regulation states: "An applicant or petitioner may withdraw a benefit request at any time until a decision is issued by USCIS or, in the case of an approved petition, until the person is admitted or granted adjustment or change of status, based on the petition. However, a withdrawal may not be retracted." 8 C.F.R. § 103.2(b)(6) (emphasis added).

arrangements and was the sole beneficiary of Kirschnick's estate. In mid-March, Anna and Christopher met, and they began dating the following month. (*Id.* at 481.) After they married in January 2011, Christopher filed an I-130 petition on Anna's behalf on March 24, 2011. On October 24, 2011, USCIS issued a Notice of Intent to Deny ("NOID") the petition, (*id.* at 639-642), which stated that "it has been determined that Ms. Pienkowski entered into her previous marriage for the purpose of evading immigration laws and sought to obtain an immigration benefit based on a fraudulent marriage," and therefore it was USCIS's intent to deny Christopher's petition, (*id.* at 641). In the NOID, USCIS gave Christopher the opportunity to submit further evidence in support of the petition. (*Id.*)

On November 22, 2011, Christopher submitted a number of additional materials in support of his petition; they are discussed below. On August 9, 2012, USCIS denied the petition. (*Id.* at 460-64.) Christopher then appealed to the BIA and requested to supplement the record with telephone records of Anna and Kirschnick's calls as well as Kirschnick's medical records. (*Id.* at 31-277; 288-435.)

On October 15, 2014, the BIA issued a decision affirming the denial of the petition and dismissing the appeal, on the ground that Christopher had failed to overcome the substantial and probative evidence that Anna had married Kirschnick for the purpose of evading immigration laws. (*Id.* at 2-5.) Christopher filed a motion for reconsideration of the BIA's order, which the BIA denied on May 29, 2015 on the ground that Christopher had failed to present additional legal argument, a change of law, or an overlooked argument or aspect of the case that convinced the BIA that it had previously erred. (*Id.* at 17-18.) This action followed.

# DISCUSSION

## A. Summary Judgment and APA Review Standards

In their motion for summary judgment, plaintiffs contend that the decisions of USCIS and the BIA should be held unlawful and set aside under the APA, 5 U.S.C. § 706. They also argue that USCIS violated its own regulations and the Due Process Clause when it failed to provide plaintiffs with the evidence adverse to them, and that the BIA failed to address those violations. Defendants argue in their cross-motion for summary judgment that the challenged decisions should be upheld as reasonable and supported by substantial evidence and that plaintiffs' due-process claim is unsupported and without merit.

Although the parties have filed cross-motions for summary judgment under Federal Rule of Civil Procedure 56, "the judicial review of an agency's final determination follows standards quite different from those applied in a typical summary judgment proceeding." *J.N. Moser Trucking, Inc. v. United States Dep't of Labor*, 306 F. Supp. 2d 774, 781 (N.D. Ill. 2004); *see also Hunger v. Leininger*, 15 F.3d 664, 669 (7th Cir. 1994) ("The motion for summary judgment is simply the procedural vehicle for asking the judge to decide the case on the basis of the administrative record."). "The APA requires that an agency's decision be set aside only if it is arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence in the case, or not in accordance with the law." *Little Co. of Mary Hosp. v. Sebelius*, 587 F.3d 849, 853 (7th Cir. 2009); 5 U.S.C. § 706. In determining whether an agency action is arbitrary or capricious, the court must consider "'whether the decision was based on a consideration of the relevant factors and whether there has been clear error of judgment.'" *Ind. Forest All., Inc. v. United States Forest Serv.*, 325 F.3d 851, 858-59 (7th Cir. 2003) (quoting *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989)). The court must satisfy itself that the agency examined the relevant evidence and articulated a satisfactory

explanation for its action, including a rational connection between the facts found and the decision. *Id.* at 859. As for "substantial evidence," it is "evidence a reasonable mind would find adequate to support a conclusion." *Ghaly v. INS*, 48 F.3d 1426, 1431 (7th Cir. 1995). Review is based solely on the record compiled in the administrative proceeding; the court does not consider new evidence, but decides whether the evidence in the administrative record supports the agency's findings. *Little Co. of Mary Hosp.*, 587 F.3d at 856; *Hunger*, 15 F.3d at 669.

**B.     Marriage Fraud**

The parties appear to agree that in I-130 visa proceedings, the petitioner bears the burden of proving by a preponderance of the evidence that the beneficiary of the petition is eligible for the benefits sought. *See Matter of Brantigan*, 11 I. & N. Dec. 493, 493 (BIA 1966); *Matter of Pazandeh*, 19 I. & N. Dec. 884, 887 (BIA 1989); *Matter of Tawfik*, 20 I. & N. Dec. 166, 168 (BIA 1990). Section 204(c) of the Immigration and Nationality Act, 8 U.S.C. § 1154(c), prohibits the approval of an I-130 petition filed on behalf of an alien who has previously tried to receive immigration benefits through a sham marriage. In making such a determination, USCIS's district director "may rely on any relevant evidence, including evidence having its origin in prior Service proceedings involving the beneficiary . . . ." *Tawfik*, 20 I. & N. Dec. at 168. The district director "should not give conclusive effect to determinations made in a prior proceeding, but, rather, should reach his own independent conclusion based on the evidence before him." *Id.* The decision must be supported by "substantial and probative" evidence of a prior attempt or conspiracy to commit marriage fraud. *Id.* at 167.

A marriage that is entered into for the primary purpose of circumventing the immigration laws is referred to as a fraudulent or sham marriage. *Matter of Laureano*, 19 I. & N. Dec. 1, 2 (BIA 1983). "A marriage is a sham if the bride and groom did not intend to establish a life together at the

time they were married." *Roe v. INS*, 771 F.2d 1328, 1331 (9th Cir. 1985) (quotation omitted); *Laureano*, 19 I. & N. Dec. at 2; *Matter of McKee*, 17 I. & N. Dec. 332, 335 (BIA 1980). "Conduct and lifestyle before and after marriage is relevant to the extent it aids in determining the intent of the parties at the time they were married." *Garcia-Jaramillo v. INS*, 604 F.2d 1236, 1238 (9th Cir. 1979); *see also Lutwak v. United States*, 344 U.S. 604, 617 (1953). "[W]here there is reason to doubt the validity of the marital relationship, the petitioner must present evidence to show that the marriage was not entered into" for the primary purpose of evading the immigration laws. *Laureano*, 19 I. & N. Dec. at 2 (citing *Matter of Phillis*, 15 I. & N. Dec. 385, 386 (BIA 1975)). "Evidence to establish intent could take many forms, including, but not limited to, proof that the beneficiary has been listed as the petitioner's spouse on insurance policies, property leases, income tax forms, or bank accounts; and testimony or other evidence regarding courtship, wedding ceremony, shared residence, and experiences." *Id.*

**C.     USCIS and the BIA's Decisions**

Plaintiffs seek to set aside the denial of Christopher's I-130 petition on the basis that the denial was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or USCIS's own regulations. (ECF No. 25, Pls.' Mem. Supp. Mot. at 20.) Plaintiffs contend that the agencies' decisions were unsupported by substantial evidence of marriage fraud and that the evidence presented by the Fligers established that Anna and Kirschnick "had a real and long term relationship." (*Id.* at 12.) They also contend that the BIA failed to consider, discuss, and weigh the evidence that they provided; improperly relied solely on Kirschnick's withdrawal of his petition and his sworn statement; failed to provide a rational reason why the Fligers' evidence failed to demonstrate that Anna and Kirschnick's marriage was not a sham; and applied too rigorous a standard of proof.

In its decision, USCIS stated that there was substantial and probative evidence that Anna and Kirschnick's marriage was a sham in that Kirschnick admitted "entering into the marriage with the beneficiary to assist her in obtaining lawful residence, never having lived together." (A.R. at 462.) While USCIS acknowledged that "legitimate marital relationships may take many forms" and that the evidence submitted by the Fligers "tend[s] to show the development of a long-term relationship . . . over a fifteen-year span," it noted that the correct inquiry is into the bride and groom's subjective state of mind at the the time they formed the marriage, and it found that the Fligers' evidence did not overcome Kirschnick's signed statements in his withdrawal that Anna asked him to marry her so she would not be deported and that they had not lived together. (*Id.* at 463.)[5]

The BIA, in its decision, discussed the following evidence submitted by the Fligers: Anna and Kirschnick's fifteen-year relationship; their joint bank accounts; Anna's active role in Kirschnick's life, even after he was admitted to a nursing home; their regular visits, gift exchanges, telephone calls and outings; their photographs together over a period of time; and Anna's designation as the sole beneficiary of Kirschnick's life insurance policy and receipt of that benefit. (*Id.* at 3-4.) But like USCIS, the BIA concluded that the Fligers' evidence was insufficient to

---

[5]Defendants cite persuasive authority for the proposition that this Court reviews only final agency action and should review only the BIA's decision because the BIA provided its own independent analysis and did not adopt USCIS's reasoning. (ECF No. 36, Defs.' Reply at 4 (citing, *inter alia*, *Jiang v. United States Att'y Gen.*, 568 F.3d 1252, 1256 (11th Cir. 2009); *Xiao v. Mukasey*, 547 F.3d 712, 717 (7th Cir. 2008)).) The Court is mindful that "[a] preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action." 5 U.S.C. § 704. Furthermore, because defendants raise this issue for the first time in their reply brief, plaintiffs did not have the opportunity to respond. Accordingly, the Court will review USCIS's decision as well as the BIA's.

Plaintiffs seem to suggest (but do not develop an argument) that USCIS's decision was faulty because the USCIS Field Office Director did not reach her own independent conclusion that Anna and Kirschnick's marriage was a sham. But it is clear from the decision that it was grounded on such an independent conclusion.

overcome Kirschnick's admissions in his sworn statement and withdrawal. The BIA quoted Kirschnick's statements that it had been Anna's idea to file the I-130 petition; that she asked Kirschnick to marry her so she could remain in the United States and not be deported; and he never lived with her. The BIA also discussed Kirschnick's later affidavit, but was unpersuaded by the Fligers' assertion that Kirschnick did not know what he was signing when he withdrew his petition. The BIA further noted that 1) this assertion overlooked Kirschnick's testimony about his conversation with Anna after having found her crying; and 2) its review of Kirschnick's interview did not indicate that he had failed to understand the questions he was asked. (*Id.* at 4.)

Kirschnick's statements in his sworn statement and withdrawal are substantial and compelling evidence that support the government's finding of marriage fraud. *See Sehgal v. Lynch*, 813 F.3d 1025, 1030 (7th Cir. 2016) (holding that husband's written admission of marriage fraud along with wife's corroborating statement was substantial evidence supporting the agency's decision) (citing, *inter alia*, *Ogbolumani v. Napolitano*, 557 F.3d 729, 734 (7th Cir. 2009) (concluding that USCIS did not err in basing denial of petition on admission of marriage fraud); *Matter of Isber*, 20 I. & N. Dec. 676, 679 (BIA 1993) (explaining that spouse's admission that she married alien as a favor to help him obtain permanent residency showed that they did not intend to establish a life together as husband and wife when they married)). It is difficult to understand why plaintiffs fault the BIA for failing to "analyze" this testimony by Kirschnick. His admissions were straightforward.

Plaintiffs try to discount Kirschnick's statements in several ways. They first point out that he "never stated that his marriage to his wife was fraudulent" and "never stated that the marriage was to circumvent immigration laws." (Pls.' Mem. Supp. Mot. at 14 (emphasis omitted).) But Kirschnick's statements amount to admissions that he married Anna, at her suggestion, for the

11

primary purpose of obtaining an immigration benefit for her. As defendants point out, (ECF No. 27, Defs.' Mem. Supp. Mot. at 10), it makes no difference that Kirschnick did not use talismanic words in his admissions. *See Ogbolumani*, 557 F.3d at 734 ("[O]ur task is not to mince words. USCIS acted reasonably by reading what was written between the lines and interpreting David's statement as an admission, in the face of mounting evidence, that he faked the marriage.")

Plaintiffs also argue that Kirschnick's sworn statement, as prepared by the USCIS adjudications officer, is unreliable because it contains typographical errors in certain questions (referring to Kirschnick's "husband" instead of "wife" and using the pronoun "him" instead of "her" to refer to Anna). Even assuming, however, that these questions were read incorrectly to Kirschnick instead of merely mistyped (which is doubtful), there is no indication in the statement that Kirschnick was confused by the questions (Kirschnick's answers do not contain the same kinds of errors), and the errors do not appear in the portion of the statement pertaining to the circumstances leading up to the marriage. The Court is not persuaded that the typographical errors undermine the substance of Kirschnick's statements.

Next, plaintiffs contend that the government's reliance on Kirschnick's sworn statement and withdrawal of his petition was "fundamentally unfair" in that these items are "wholly unreliable" due to the lack of detail in the withdrawal and the fact that the interview "took place while [Kirschnick] was unhealthy." (Pls.' Mem. Supp. Mot. at 16, 18.) The Court does not see, and plaintiffs do not explain, why the succinct nature of Kirschnick's withdrawal renders it unreliable. As for Kirschnick's health, although plaintiffs submitted a multitude of his medical records, there is nothing in those records that suggests that his condition or the medications he was taking would have undermined the voluntariness of his admissions or his ability to understand O'Neill's questions. The medical records are devoid of any context and do not support plaintiffs' conclusory assertion

of Kirschnick's "diminished" capacity. (ECF No. 35, Pls.' Reply at 3.) Plaintiffs assert that Kirschnick "recanted" his admissions, but, in the Court's view, it is the subsequent affidavit by Kirschnick that bears indicia of unreliability.[6] And, as the BIA explained, Kirschnick did not recant his admission about the circumstances leading up to the marriage, nor do Kirschnick's intereview responses indicate in any way that he had difficulty understanding the interview questions. There is an undercurrent throughout plaintiffs' argument that Kirschnick's statement was coerced or given under duress. "An alien claiming coercion by government officials must come forward with proof establishing a prima facie case before the Service will be called on to assume the burden of justifying the manner in which it obtained the evidence." *Sehgal*, 813 F.3d at 1030 (internal quotation marks and citation omitted). Plaintiffs' contentions about Kirschnick's ill health and confusion are far too vague to undermine his admissions of a sham marriage.[7] *See id.* at 1031.

Plaintiffs further argue that their "extensive" evidence was sufficient to demonstrate that Anna and Kirschnick "had the intent to enter into marriage for *bona fide* purposes." (Pls.' Mem. Supp. Mot. at 12.) The evidence they submitted to the agencies consists of the following:

- An affidavit from Christopher
- An affidavit from Anna in which she discussed her relationship with Kirschnick
- A copy of Kirschnick's death certificate, which lists Anna as his surviving spouse
- A copy of a Cemetery Interment Rights Purchase Agreement as to Kirschnick, signed by Anna
- A copy of an Interment Order for Kirschnick's remains, signed by Anna
- An invoice to Anna from the Neptune Society for Kirschnick's funeral arrangements

---

[6]Although Kirschnick claimed therein that he had lived with Anna from their marriage (in 1995) until 2000, that statement contradicts even Anna's sworn testimony that they lived together for only one year, beginning in 1999. And, as noted above, the affidavit is neither dated nor notarized.

[7]Plaintiffs also claim that, according to Kirschnick's affidavit, he felt "pressured" to withdraw his I-130 petition. (Pls.' Mem. Supp. Mot. at 8; ECF No. 28-1, Pls.' Am. Submission of Undisputed Facts ¶ 9.) His affidavit says nothing of the sort.

- Copies of Kirschnick's medical records
- A "face sheet" relating to Kirschnick's admission to Resurrection, which summarizes Kirschnick's contact details and medical history and condition, and lists Anna as his spouse
- A copy of an email to Anna from Rosalind Berg of Resurrection, stating that from February 2007 until his death, Anna had visited Kirschnick weekly, been supportive and involved in his care, and had purchased and promptly brought Kirschnick personal items that he had asked for
- A copy of an automobile insurance policy covering Anna and Kirschnick from June 2002 to June 2003
- Copies of certain 2004, 2005, and 2007 statements for Anna and Kirschnick's joint checking accounts with CIB Bank and First Bank, with copies of canceled checks signed by both
- Four pages of photos showing that Anna and Kirschnick had gone on trips together to California in 1996 and Florida in 1998 and had shared family dinners and nursing home visits
- A copy of a Department of Veterans Affairs ("VA") life insurance form in which Kirschnick designated Anna as his sole beneficiary, and an August 2011 statement from the VA that accompanied a $4,950.09 payment to Anna on that life insurance policy
- Copies of 2008 and 2009 telephone records that list Anna and Kirschnick's calls with each other

(A.R. 7; 494, 499-636; 754-996.)[8] The Court has reviewed this evidence in detail. It shows that Anna took care of Kirschnick when he moved to a nursing home, years after they married; she made funeral arrangements after he died; they commingled some finances years after they married; and she was his beneficiary. It also shows that they developed a close relationship over the years and cared for each other. But, in the Court's view, it has little if any bearing on their subjective intent when they married in 1995, and in any event it does not demonstrate that they intended to establish a life together *as marriage partners* at that time.

Although plaintiffs argue that the BIA's decision "fails to give any rational reason as to why"

---

[8]Also included among these materials are Anna's 2006 income tax returns and schedules and copies of Anna and Kirschnick's driver's licenses and various of their credit cards, (A.R. 524-529, 531), but neither the administrative decisions nor the parties discuss those items. In any event, they appear to be at most only marginally relevant to the salient issue.

14

their evidence fails to overcome the finding of marriage fraud, (Pls.' Mem. Supp. Mot. at 13), plaintiffs themselves fail to explain why they believe their evidence does so. They put great stock in the fifteen-year length of the marriage but neglect to discuss the nature of the relationship. Plaintiffs also complain that Kirschnick's sworn statement is "cherry picked," and they emphasize Kirschnick's testimony that he and Anna had had sexual relations. (*Id.* at 14 & n.3-16.) The Court agrees with defendants that the context of that statement, in which Kirschnick said that he did not feel that Anna was taking advantage of him, but rather that he was taking advantage of her because she is attractive, actually "underscores the *quid pro quo* sentiment" underlying Kirschnick's view of their marriage. (Defs.' Mem. Supp. Mot. at 11 n.5.) In addition, plaintiffs emphasize Kirschnick's testimony that he and Anna had joint bank accounts. But those accounts were not opened until 2004, nine years after the marriage. Plaintiffs also argue that Anna and Kirschnick's commingling of funds, travels together, consistent visits and telephone calls, and Anna's insurance beneficiary status demonstrate that they "established a life together as husband and wife, regardless of how . . . or why" they married. (Pls.' Mem. Supp. Mot. at 17.) This argument misses the mark; the issue whether they intended at the time of their marriage to establish a life together as husband and wife. The Court is also unpersuaded by plaintiffs' speculation that "the Service made a finding even before meeting the parties that their marriage was less than *bona fide* due to the[ir] age difference." (*Id.* at 18.) USCIS's decision does not mention their ages, and the BIA's decision mentions only that Kirschnick was 86 at the time of his death.

USCIS and the BIA adequately considered the evidence the Fligers submitted, which left unrebutted Kirschnick's testimony about the circumstances that led to his and Anna's marriage, which demonstrates that they married for the primary purpose of evading immigration laws. USCIS listed each piece of evidence and acknowledged that it shows that Anna and Kirschnick developed

15

a long-term relationship over their fifteen-year marriage, but found that it did not bear on their intent when they married. The BIA specifically discussed, in two sections of its decision, several of the items the Fligers submitted and concluded that although they reflected a fifteen-year relationship, they were not sufficient to overcome Kirschnick's admissions. It is true that the decisions could have provided more specific reasoning, but they "nonetheless provide[] an adequate explanation for the decision[s], and nothing more is required." *See Ogbolumani*, 557 F.3d at 734. As in *Ogbolumani*, while the agencies "could have fleshed out why [they] found each piece" of the Fligers' evidence unpersuasive, the Seventh Circuit has "never required" them to "'write an exegesis on every contention'" raised. *See id.* at 734-35 (quoting *Rashiah v. Ashcroft*, 388 F.3d 1126, 1130 (7th Cir. 2004)).

Finally, plaintiffs contend that their due process rights were violated by USCIS's violation of one of its regulations, and the BIA's failure to address that violation, when plaintiffs were not provided with or given the opportunity to review Kirschnick's sworn statement. In response, defendants maintain that plaintiffs had adequate notice of derogatory information upon which the agencies' adverse determinations were based because USCIS quoted Kirschnick's withdrawal statement in the NOID. The regulation on which plaintiffs rely, 8 C.F.R. § 103.2(b)(16), "prohibits the agency from basing a determination of statutory eligibility on information that has not been disclosed to the applicant or petitioner." *Sehgal*, 813 F.3d at 1031. The Seventh Circuit has stressed repeatedly that the "better procedure" is for agencies to "produce the statement in question," and it has expressed puzzlement at USCIS's continued failure to do so. *See id.*; *Ghaly*, 48 F.3d at 1435. Nonetheless, the Seventh Circuit has interpreted the regulation at issue to recognize that "a summary can suffice." *Sehgal*, 813 F.3d at 1031 (citing *Ghaly*, 48 F.3d at 1434-35). Here, as the BIA explained, the NOID sufficiently advised plaintiffs of the derogatory information upon which an

16

adverse determination might be made by quoting Kirschnick's withdrawal statement verbatim, and plaintiffs were given the opportunity to rebut it. Kirschnick's sworn statement contains the same derogatory information as his withdrawal statement, of which the plaintiffs had notice. Therefore, USCIS did not violate the regulation; the BIA's determination was not arbitary nor capricious; and plaintiffs' due process rights were not violated. *See id.* at 1031-32 (concluding that USCIS had complied with § 103.2(b)(16) where it had provided plaintiffs with a summary of a handwritten letter that confessed marriage fraud); *see also Ogbolumani*, 557 F.3d at 735 ("[T]he regulation does not require USCIS to provide, in painstaking detail, the evidence of fraud it finds.").

After considering all of the record evidence, the Court is unable to say that the decisions of USCIS and the BIA were arbitrary and capricious, unsupported by substantial evidence, constituted an abuse of discretion, or were otherwise not in accordance with law. Moreover, the Court cannot say that it would have reached a different conclusion from that of the agencies, whose decisions had an ample rational basis in the facts and law, did not apply incorrect legal standards or too rigorous a burden of proof, and were announced in terms adequate to satisfy this Court that the decision makers "heard and thought" and did not merely react, *id.* at 735.

## CONCLUSION

Plaintiffs' motion for summary judgment [25] is denied, and defendants' cross-motion for summary judgment [26] is granted. Judgment will be entered in favor of defendants and against plaintiffs. Civil case terminated.


SO ORDERED.                    ENTERED:    June 23, 2017

_____
**JORGE L. ALONSO**
**United States District Judge**